UNITED STATES DISTRICT COURT
                    EASTERN DISTRICT OF VIRGINIA
                         Alexandria Division


-------------------------------:
                               :
BRIAN A. SINGLETON,            :
              Plaintiff,       :
                               :
      -vs-                     :    Case No. 1:12-cv-97
                               :
                               :
EAGLEEYE RADIOLOGY, INC., et al.,:
              Defendants.      :
                               :
-------------------------------:



                        HEARING ON MOTIONS


                        November 9, 2012


                 Before:  Liam O'Grady, USDC Judge







APPEARANCES:

James C. Bailey and Sara M. Klayton,
Counsel for the Plaintiff

John F. Scalia, Counsel for the Defendants

2

1          THE CLERK:  Case number 12-civil-97, Brian Singleton

2     versus EagleEye Radiology, Inc., et al.

3          Will counsel please state your appearance for the

4     record.

5          MR. SCALIA:  Good morning, Your Honor.  John Scalia

6     on behalf of defendants.

7          THE COURT:  All right.  Good morning.

8          MS. KLAYTON:  Good morning, Your Honor.  Sara Klayton

9     from Bailey & Ehrenberg on behalf of the plaintiff.  I would

10    like to introduce my colleague --

11         MR. BAILEY:  James Bailey, thank you, for Mr.

12    Singleton.

13         THE COURT:  All right, good morning.  This comes on

14    crossmotions for summary judgment or partial summary judgment.

15    And also an objection by EagleEye to rulings made by Judge

16    Buchanan regarding the discovery and supplemental discovery

17    offered by EagleEye that Judge Buchanan refused to consider,

18    and held the parties to their prior discovery responses.

19         I am not going to hear argument on Judge Buchanan's

20    ruling.  I affirm that ruling, I believe that it was correct.

21    That Dr. Singleton and counsel were prejudiced by the late

22    discovery that was supplied, and the attempts to amend the

23    responses given previously.  The facts of the discovery process

24    fully support her rulings, and she was within her legal rights

25    to make those rulings.

3

```
1          So, with that said, why don't -- I will hear from

2    you, Ms. Klayton --

3          MR. BAILEY:  Mr. Bailey for Dr. Singleton.  Your

4    Honor, I was going to file a motion to strike certain

5    affidavits that were filed in connection with the defense's

6    opposition, but I thought I would spare the Court additional

7    filings on the docket and just mention that this case has been

8    fully briefed, robustly briefed.  There is a lot of discovery.

9          But from our position, Dr. Singleton's position is

10   this is actually a very simple case.  It's a textbook case of

11   shareholder oppression.  If you were teaching a class on

12   shareholder oppression, these are the kinds of facts that you

13   would use as examples of shareholder oppression.

14         The cases that we cite in our brief are nearly

15   foursquare on point, and this is how these cases come together.

16   In every field, every profession there is a time where things

17   gather together and it creates fact patterns where things

18   predictably occur.  Things in this case predictably occurred to

19   freeze out the minority shareholder who was the founder.

20         The cases in Delaware on point speak to this exactly.

21   It could not have been any better for plaintiff.

22         So, I would submit that if this Court does not find

23   that this is shareholder oppression, that no one ever could win

24   a shareholder oppression case.  And I do often try not to be

25   hyperbolic in my statements, and I never use the word
```

1   "outrageous" or make accusatory statements like that.  But, you

2   know, everything that the defendants have said nearly in their

3   affidavits -- for example, Peter Vangeertruyden in his sworn

4   affidavit in support of their opposition said that this July

5   31, 2011 e-mail exchange wherein my client wanted to get his

6   pay compensation squared away, that was the reason that they

7   took this action.

8           But the undisputed factual record of the e-mails

9   shows that Amy Kirby started the resistance with these other

10  people in March, April, May of 2011.  It certainly was not this

11  July 31 e-mail exchange.

12          You know, they say on some level there was a notion

13  that Brian Singleton edited these agreements, yet at Exhibit 77

14  of our opposition we have the e-mail exchange where defendant

15  Robert Barlow in 2006 actually edited the change of control and

16  termination provisions.  And we have, of course, the e-mail

17  record that has metadata that shows that he actually did this.

18          And that brings me to the point of the contract.  We

19  have provided on point case law out of Missouri, affirmed by

20  the Eighth Circuit, that shows a change of control payment, a

21  single trigger page -- a single trigger change of control

22  provision allows the executive to get paid immediately.

23          Now, someone might say from a judicial realism

24  standpoint, this seems unfair because this is a large payment

25  to Dr. Singleton.  And I know that sometimes juries or courts

1  might think, well, what is the fair approach in construing this

2  contract?  You know, the law abhors various things, I can't

3  recall, I am not expressing those --

4          THE COURT:  I read a contract and I interpret the

5  language in the contract.  And if it is unambiguous, it's

6  unambiguous.  If it --

7          MR. BAILEY:  Yes, sir.  Then I won't --

8          THE COURT:  There is no allegation here that the

9  parties weren't on equal footing and that they didn't have the

10  capacity to negotiate a contract that was an arm's length

11  contract, right?

12          MR. BAILEY:  Well, that's a notion, except that

13  actual affirmative defense is not allowed to be raised pursuant

14  to Judge Buchanan.

15          THE COURT:  Right.

16          MR. BAILEY:  But I bring that up only as an

17  overarching background for the prism of review of the contract.

18          But coming to the contract is very easy.  Section 8

19  talks about how the termination of employment can occur, the

20  end of employment, termination in the context of an executive

21  compensation agreement.

22          And, you know, this is a standard thing that

23  attorneys who work in the executive compensation field do all

24  the time.  There is a section that talks about termination.

25  And I remember talking about this on the motion to dismiss

1    arguments early on.  When the employee can terminate, it can

2    happen under usually one of two different ways.  Something bad

3    where the company benefits from it.  And something better for

4    the employee where he can then leave and get a fruit of some

5    additional money.  Okay.  This is so executives will take

6    risks.

7              In this case, it clearly is not disputed that Dr.

8    Singleton deliberately did not maintain 51 percent of the

9    shares for his idea because he thought he was protected

10   otherwise.  And that's a reasonable way to protect yourself.

11   To say, look, I believe this can be a big company, and I am not

12   going to benefit from this company -- this company will not

13   benefit if I try and keep all the control in all the shares.

14   But, look, it was my idea, and if you guys want to get rid of

15   me and kick me to the curb, you are going to have to pay me or

16   reasonably negotiate with me.  Which he was trying to do in the

17   fall of 2011.

18             Which brings me back to the textbook nature of this

19   case.  At every turn it seems, every turn, the company could

20   have done something that was reasonable.  Yet they chose, they

21   made deliberate decisions.  I can make the decision not to fire

22   him, but instead I will fire him.  I will make a decision to be

23   honest and up front with him and negotiate with him, but I will

24   not.  I will tell him we bought his shares.  I will tell him we

25   didn't buy his shares.

1    At every phase it has been a multiheaded hydra trying

2 to deprive Dr. Singleton.  And I do not believe that I am

3 saying this in any hyperbolic fashion.

4    They are saying that the company now is insolvent.  I

5 just reviewed their Web site.  They have now 17 doctors there

6 that are being paid high salaries.  So, it's not like the

7 company is doing poorly.

8    I have heard a notion that maybe they will file

9 bankruptcy, but that would -- I won't delve into that.  I mean,

10 that would be a fiduciary breach because they could have

11 resolved the case as prudent directors.  They could have

12 resolved the case earlier.  But I don't think that that is a

13 realistic possibility.

14    So, I have -- I started to talk about the contract.

15 There is two sections, section 8, section 10.  Section 10,

16 change of control.  A mandatory/permissive distinction.

17 Mandatory.  Upon the consummation of a change of control, he

18 shall be paid the money.

19    Interestingly, at Exhibit 77 to our opposition, you

20 can see how this came about because in the earlier draft of the

21 agreement that Robert Barlow edited, it actually said, upon a

22 change of control, you will get -- well, I am looking at

23 another provision.  18 months base salary plus, et cetera.

24    And then he edited that and he did what they call

25 under ERISA, they reticulated it.  Like the Internal Revenue

1 Code where they said, different buckets of money come under

2 different sections of the contract.  So, you don't always have

3 to keep repeating it.

4          So, they said in section 8, there is two ways.  You

5 could be terminated for cause, or terminate yourself for good

6 reason.  There is three ways you could terminate yourself for

7 good reason.  If they don't pay you.  If they change, if they

8 change control.  If they breach the contract.  If they move the

9 headquarters.  These are the reasons the employee can leave.

10          And if he can leave, he can say, I'm going to leave.

11 And there is a cure provision.  And while -- the company can

12 then say, we don't want you to leave.  We are going to make

13 sure we don't move the headquarters, Brian.  You are important

14 enough to us, that was ill thought of and we reverse that

15 course.  Then it cures his--

16          THE COURT:  Good cause.

17          MR. BAILEY:  The good cause.  But under the change of

18 control provision, it is plain -- it says upon the consummation

19 of change of control, he shall get the money.

20          And I believe if you look at the e-mail record --

21 well, let me finish this notion.  It basically says, you shall

22 get it.  The Peggy Deal case from Missouri is right on point.

23 It shows that upon a change of control, you get the money.

24          And I believe if you look at what these folks were

25 trying to do in the run-up to this, is they kept trying to

1    frustrate it.  And they walked themselves, you know, into a

2    buzz saw through not prudently reading the contract in advance.

3    And they could have avoided it.  But this is exactly why there

4    is a change of control provision in this contract.

5          At this point, Your Honor, I don't think I have much

6    more to add unless the Court has particular questions because I

7    believe our brief is very clear on this issue.

8          THE COURT:  No.  I will give you a chance to respond

9    to Mr. Scalia's argument.

10         MR. BAILEY:  Thank you, Your Honor.

11         THE COURT:  All right.  Thank you, Mr. Bailey.

12         MR. SCALIA:  Good morning, Your Honor.

13         THE COURT:  Good morning.

14         MR. SCALIA:  Your Honor, I'll start by addressing

15   Count 3, which is the significant claim under the --

16         THE COURT:  Severance.

17         MR. FAHEY:  For severance under the-- for purposes of

18   the summary judgment motion at least under the 2010 agreement.

19         First of all, I don't believe that the Missouri case

20   is on point.  My understanding is that that is not what we're

21   talking about here.  And our research has unearthed not a

22   single case that deals with what plaintiff's counsel is

23   contending his client is entitled to under this contract.

24   Namely, massive change of control severance benefits that are

25   triggered even if there is no adverse consequence to him as a

1   result of the change of control.

2          In fact, even if he benefits in the change of

3   control, under their theory he is entitled to a windfall

4   payout.  That's a perverse result in and of itself.

5          THE COURT:  Well, isn't it clear, in the event of a

6   change of control as defined below, immediately following the

7   consummation of such change of control, the company shall pay

8   the employee the gross amount, et cetera.

9          That is pretty clear language, isn't it?  And I don't

10  think I need to look at any Missouri cases.  I am required to

11  look at the contract and determine whether the contract is

12  ambiguous or unambiguous.  If it is unambiguous, I follow the

13  contract language, unless the parties were at such differences

14  that it's not an arms length contract.  And there is no

15  evidence of that, and you have been precluded from using that.

16         So, I assume that when two parties negotiate, the

17  reasons provided are reasonable, but they really aren't -- you

18  know, they don't make any difference to me.  I am required to

19  look at this contract.

20         So, the argument you're making is a fairness

21  argument, and I understand it, but that's not my job.

22         MR. SCALIA:  Yeah, I am not -- I don't intend to make

23  just a simple equity or fairness argument.  My point there is

24  that if you -- as an initial point, the result he is asking the

25  Court to rule in his favor on would be a perverse result.

1        THE COURT:  Where in the contract -- that is a

2  fairness argument.

3        MR. SCALIA:  But it's a contract interpretation or

4  construction argument too because courts are required to --

5        THE COURT:  Point me to the language that you want --

6        MR. SCALIA:  -- read a contract in a way that will

7  not create a perverse result if it can do so.

8        THE COURT:  Well, tell me where in the contract --

9        MR. SCALIA:  So, my key point --

10        THE COURT:  Now, you listen to me for a second.

11        MR. SCALIA:  Okay.

12        THE COURT:  Where in the contract is this term

13  modified so that I can accept your perverse argument?

14        MR. SCALIA:  Right.  Well, first of all, it's not a

15  defined term.  It could have been -- the parties could have

16  defined it if they wanted to clarify the --

17        THE COURT:  I don't have any -- you know, it means

18  what it says.  Consummate is not a difficult word.

19        MR. SCALIA:  Your Honor, if you accept the

20  plaintiff's interpretation, then it renders another provision

21  in the contract meaningless.

22        THE COURT:  Section 8?

23        MR. SCALIA:  Section 8, which has the good reason

24  cure.  It creates a result where if the plaintiff actually did

25  suffer an adverse consequence, the company would have a right

1    to cure the change of control.

2           If he doesn't receive any adverse consequence and in

3    fact receives a benefit as a result of a change of control

4    under the plaintiff's theory, the company would have no right

5    to cure the change of control.  He would be entitled to it

6    immediately.  And that result just doesn't make sense.

7           THE COURT:  So I need to look at --

8           MR. SCALIA:  It renders obsolete an express provision

9    in the contract.  And that is a clear violation of contract

10   construction rules.

11          THE COURT:  All right.  So, I need to look at whether

12   8 and 10 are inconsistent or not.  Okay, I understand that

13   argument.  Go ahead.

14          MR. SCALIA:  And just to hammer that point home.  If

15   you read, and I think we have briefed this, but if you read the

16   contract the way we're urging you to, then everything is

17   consistent and every provision of the contract is -- nothing is

18   read out of the contract and everything in the contract is

19   consistent with the other provisions.

20          There was a lot of discussion about shareholder

21   oppression and I think generally what horrible guys my clients

22   are.  I will try to avoid getting into that issue because I

23   think on summary judgment the issues are pretty

24   straightforward, and there are not a lot of truly genuinely

25   material facts, and those are that genuinely material are

1    undisputed.

2              So, I would like to kind of walk through those.  And

3    if I can start -- well, Your Honor, I would like to first

4    address your ruling affirming the magistrate's ruling just

5    because I think the only issue that it's relevant to for

6    today's purposes is Count 1 with respect to the stock options.

7              And the magistrate's ruling that you have affirmed

8    says that we are judicially estopped from disputing the

9    ownership over those options.

10             THE COURT:  I looked very carefully at the record

11   that was before Judge Buchanan.  And the way that this company

12   responded to the discovery was, to put it kindly,

13   schizophrenic.  I think Judge Buchanan did exactly what I would

14   have done if I had been in the same position.

15             So, you know, it resolves the stock issue.  It

16   resolves the authentication of the 2010 contract.

17             What else do you want to talk about?

18             MR. SCALIA:  Well, Your Honor, on that point, on

19   Count 1, for there to be judicial estoppel, there has to have

20   been some court reliance on what we did.  So, even if what we

21   did was entirely schizophrenic or even worse, I don't think

22   there is any argument to be made that the court in any way

23   relied on anything that we did or didn't do.  And that's the

24   legal standard.

25             And furthermore, the plaintiff didn't even rely on

14

1    anything.  The plaintiff didn't suffer any prejudice as a

2    result of anything that we did during the course of discovery.

3            So, I really think that Count 1, that we should not

4    be judicially estopped.  I don't think we can be judicially

5    estopped from asserting that position.

6            THE COURT:  Doesn't Judge Buchanan and the Court have

7    a right under the sanction power of the Court to find liability

8    at any junction for discovery abuses?

9            And I will let Mr. Bailey speak for himself, but if

10   you're getting responses that say, yes, you're entitled to

11   200,000-something shares and then the next time you're not --

12   and you're making decisions on litigation strategies based on

13   the responses you get from the other side, aren't you?

14           MR. SCALIA:  Yes, but I don't think that any of that

15   took place.  We, as a litigation tactic, initially we decided

16   to repurchase his shares that were subject to the option.

17           THE COURT:  Right.

18           MR. SCALIA:  And it was -- and we made it clear, it

19   was always clear that that was a litigation tactic.  A tactic,

20   it was not a legal concession of liability.

21           The magistrate didn't like our doing that, even

22   though we were contractually entitled to do it under the

23   governing stock incentive plan.

24           And during the course of litigation, we came to the

25   conclusion as a litigation tactic that it would be advantageous

1   to revoke that repurchase.  The plaintiff had not acted on the

2   repurchase, had not cashed the check or done anything in

3   reliance on our letter repurchasing, exercising our right to

4   repurchase.  And he did not rely on our letter, August 29

5   letter revoking it.  And there is no discovery that needed to

6   be had with respect to it.

7         And with respect to why -- the accusation is that we

8   were somehow hiding this from the plaintiff.  Your Honor, my

9   client sent a letter under the stock incentive plan.  It was

10  required to be sent registered mail to the plaintiff himself at

11  his home.  And that's what we did.

12        Now, should I -- I didn't even get a copy of the

13  letter from my client, I didn't know when it had gone out.  I

14  only learned that after the fact.  Should I have disclosed that

15  to the other side?  Should I have Bates numbered it and

16  produced it during the course of discovery?  Your Honor, it

17  never occurred to me to do that.  And again, I didn't even know

18  when it had gone out.

19        I didn't learn about that until Mr. Scott's

20  deposition.  And we were as surprised as anyone.  In fact, I

21  didn't learn until the September 28 hearing before the

22  magistrate when I was discussing the repurchase -- and I

23  happened to mention that it was my understanding that my client

24  had revoked the repurchase.  Mr. Bailey looked at me kind of

25  with a surprised look.  And I was surprised that he was

1   surprised because we assumed that the letter had been received.

2          And we didn't know why -- we were kind of wondering

3   when we were going to hear from the plaintiff or his counsel

4   about it.

5          And at that hearing Mr. Bailey, he told the Court,

6   you know, I am unaware of this revocation, I will confer with

7   opposing counsel about it.  He represented to the Court that he

8   would confer with me.  He did not confer with me after the

9   hearing or at any point.  He filed a motion to strike and for

10  evidentiary sanctions.

11         And, you know, the other point I tried to make to the

12  magistrate that didn't go over very well was to ask the Court

13  to look at the plaintiff's own behavior in this case.  He

14  received a registered letter from my client, and he decided for

15  whatever reason -- and, you know, maybe it was with the advice

16  of counsel, maybe it wasn't, but he decided to return that

17  letter.

18         So, he knew better than anyone that he had received a

19  letter.  And he was not going to accept it or open it.

20         So, I don't know why he couldn't have contacted his

21  attorney if he had a question about it.  I don't know why his

22  attorney couldn't have contacted me if he had a question about

23  it.

24         But from our perspective, we thought the letter had

25  been received, and we didn't think we were hiding anything.

1          THE COURT:  Okay.  All right.

2          MR. SCALIA:  Okay.  So, I don't know if you will

3    allow me to address Count 1 or not, that's the only reason I

4    bring that up.

5          THE COURT:  Well, I am affirming Judge Buchanan.

6          MR. SCALIA:  Okay.  So, I will start with Count 2

7    then, which is -- Count 1 and Count 2 both dealt with the 2011

8    e-mail exchange or the amendment to the two integrated

9    contracts.

10          And with respect to Count 2, he is claiming that he

11    is entitled to unpaid wages.  And in fact, the count itself

12    makes clear that it is a claim for wages.  It's not a claim for

13    1099 compensation under an independent contractor agreement.

14          He is not suing under the independent contractor

15    agreement itself.  It's not attached to the complaint.  It's

16    not -- there is no claim, at least in my interpretation of the

17    complaint, there is no claim directly under the ICA, nor could

18    there be because there is a binding arbitration provision.

19          And if we had understood at the beginning of this

20    case, or at any point before the summary judgment motion was

21    filed, that he was claiming to sue under the ICA, we would have

22    raised an arbitration defense to that.

23          So, we have been deprived of that by him now arguing

24    that he is entitled to 1099 compensation under Count 2 that is

25    for unpaid wages.  So, I think that part of the issue should be

1    off the table.

2          But the more critical problem is that it is really

3    arising out of this alleged amendment to these two integrated

4    contracts.  And I think that the facts are straightforward and

5    I think they are undisputed.  The parties don't exist -- at

6    least for purposes of summary judgment, the existence or the

7    validity of the 2010 agreement or the 2010 independent

8    contractor agreement, we are not disputing the fact or the

9    existence of the e-mail exchanges between plaintiff and Dr.

10   Gibson in July of 2011.

11         And I think it's undisputed that the plaintiff's July

12   20 e-mail proposal is an amendment he is seeking.  If you look

13   at the terms, although he doesn't expressly state, I want to

14   amend both of my contracts, if you look at the terms that he is

15   discussing, they fall within both, each of those contracts,

16   some in one, some in another.

17         And there is no evidence that it was ever clear to

18   Dr. Gibson or any other board member that he was seeking an

19   amendment of two integrated contracts.  He was just talking

20   about, you know, I want to increase compensation, I have got a

21   one-year deal that I want amended.

22         And to the extent that he was referring to anything

23   in particular, he was only referring to the ICA, which was a

24   one-year agreement.  It did not automatically expire, it

25   automatically renewed at the end of one year.  So, there was no

1    reason in the first place for him to be seeking new

2    compensation.

3          But to the extent he was, there is no evidence that

4    he was doing it under both of these contracts.  And if it was

5    clear at all to any of the board members, he was talking about

6    clinical compensation under his ICA.

7          So, you know, right there I don't think that the

8    e-mail exchange where it is not clear what contracts you are

9    actually amending can sufficiently amend those two contracts.

10   There is absolutely no meeting of the minds.

11         THE COURT:  So, Dr. Singleton's argument is that if I

12   find that the 2011 modification did not -- wasn't a binding

13   contract, that the defendants still owe him $159,000 versus

14   160-something thousand dollars if I find that it is

15   enforceable.  And your argument against that is that I can't

16   look at the ICA to decide whether he is due compensation

17   because there is an arbitration clause in there?

18         MR. SCALIA:  That's partly my position.  Our position

19   is if Your Honor were to find that the 2011 e-mail exchange is

20   not an effective amendment to those contracts, then at least

21   for purposes of summary judgment the 2010 agreement is a valid

22   and binding agreement.  And any moneys that he can establish he

23   is owed under the 2010 agreement that have not been paid to

24   him, he would be entitled to.

25         But on that point, we don't believe he has met his

1   burden of establishing, at least for purposes of summary

2   judgment, that he is entitled to any payments under the 2010

3   agreement.  He is claiming for significant bonus payments, but

4   he has not -- the express terms of the contract say that it's

5   only for 12 months of continuous profitable gross margins.

6   There is no evidence that I have seen in the record that that

7   ever took place.

8           THE COURT:  So, there is three --

9           MR. SCALIA:  So, that's with respect to the 2010

10  agreement.  And then with respect to the 2010 independent

11  contractor agreement, two related points.  Yes, you're right,

12  it has an arbitration provision, so it can't be addressed by

13  this Court.

14          And if we had been, you know, on notice that he was

15  actually suing under the agreement, and if it had been -- if

16  there had been a count under the ICA and it was asking for, you

17  know, clinical compensation, 1099 as opposed to unpaid wages,

18  then we would have asserted our rights to pursue arbitration

19  instead of having it adjudicated here, or at least considered

20  that.

21          But I think the bigger point is that under the ICA,

22  again, it's not wages.  His Count 2 is for wages.  The clinical

23  compensation, it is undisputed, it is 1099 under the ICA.

24  Which, you know, is another point as to why his argument that

25  the 2011 e-mail exchange somehow amended these two contracts --

1    because you have got two very different contracts.  One is for

2    wages, it deals with an employment relationship.  The other is

3    for 1099 compensation and an independent contractor

4    relationship.  One calls for Virginia law.  The other calls for

5    Delaware law.  One has an arbitration provision, the other

6    doesn't.

7            None of this was told to the board during this e-mail

8    exchange between plaintiff and Dr. Gibson.  They didn't know

9    what contracts they were revising.  They didn't have them in

10   front of them.  And he never told them, it's this contract and

11   this contract, and I want to merge the two somehow.

12           THE COURT:  Okay.

13           MR. SCALIA:  I think it's undisputed that both the

14   2011 agreement and the 2010 ICA contain express integration

15   provisions.  And they both say that any amendments must be in

16   writing and signed by the parties.

17           These e-mails -- for our purposes here, the cases

18   that plaintiff cites for the proposition that e-mails can

19   constitute a signed writing, they are not, they are not

20   persuasive, they are not availing.

21           What we're talking about here is a situation where

22   you have two very different integrated contracts that both say

23   amendments must be in writing, signed by the parties, by a duly

24   authorized --

25           THE COURT:  How about the performance, what do I do

1   with that?  Because EagleEye paid him the additional

2   compensation beginning after the exchange of e-mails, correct?

3            MR. SCALIA:  Right.  And plaintiff points to that as

4   somehow subsequent ratification.  But that in and of itself, I

5   don't think, is enough to show that the parties have agreed to

6   all of the terms that the plaintiff set forth in his July 20

7   e-mail.

8            And on that point, if you look at the record, Your

9   Honor, there is the July 20 e-mail with the proposal of all

10  these terms that include two different contracts, although he

11  doesn't say that.  Then there is some back and forth.  There is

12  the July 31 e-mail from Dr. Gibson that plaintiff is

13  characterizing as the offer e-mail.  And then his e-mail the

14  same day accepting it.  But in his acceptance --

15           THE COURT:  Which goes to all the members of the

16  board, right?

17           MR. SCALIA:  I believe it did go to all of the

18  members of the board.  But the key point is that he calls that

19  an acceptance.  Even on its face it is not an acceptance

20  because Dr. Gibson's e-mail only speaks to one particular

21  provision or one particular part of the plaintiff's overall

22  comprehensive proposal.  And it has to do with his clinical

23  hours, his obligation of working clinically under the ICA.  So,

24  that would be 1099 anyway.

25           But that's the only piece of the plaintiff's

1    January 20 proposal that Dr. Gibson -- that could at all be

2    considered an agreement or an offer.

3         And then plaintiff's response, his acceptance says,

4    okay, I accept that under the following terms. And then he

5    lists all of his original July 20 proposals.

6         So, even his "acceptance," it is a conditional

7    acceptance or it's a counteroffer. He is accepting one

8    provision with conditions on it. And there is no evidence that

9    those conditions were ever accepted.

10        And the mere fact that for whatever reason the

11   company started paying him his clinical compensation, 1099

12   compensation, is not sufficient evidence that it was ratifying

13   all of the terms in his July 20 proposal.

14        And furthermore, I think there is counterweighing

15   evidence that shows that they were doing anything but

16   ratifying. The whole reason of the shareholder revolt was they

17   were outraged that, you know, from their perspective the

18   plaintiff had rammed this thing through Dr. Gibson. And Dr.

19   Gibson, you know, didn't stand up to him or whatever. But they

20   were outraged that this had happened. That was the trigger,

21   that was the final straw.

22        Yes, there were discussions previously in the spring

23   and there were discussions in the previous year over

24   dissatisfaction concerning the plaintiff's performance, but it

25   was the July 31 acceptance e-mail that led to the shareholder

1   revolt.

2           That revolt in and of itself shows that there was no

3   ratification of those terms.  It's the very opposite of that.

4           And then when the new board came in, they made it

5   clear from the outset -- in Bob Barlow's communications with

6   plaintiff, he made it clear, we, number one, we don't agree

7   that we owe you the 50,000 for the stock option.  And we don't

8   believe that this 2011 e-mail exchange is a binding agreement

9   on us.

10          That was clear to him from the get-go, long before he

11  was -- you know, he filed this lawsuit.  So, I think if you

12  look at the subsequent conduct, it actually shows that not only

13  was there no ratification, but there was resistance to any

14  implication or argument that that 2011 agreement was binding.

15          THE COURT:  All right.

16          MR. SCALIA:  And none of that -- you know, the cases

17  about that e-mails can constitute a signed writing, they don't

18  deal with the situation here where, number one, you have two

19  integrated contracts that both say it has to be in a writing

20  signed by the parties, and it has to be signed by a duly

21  authorized director of the company.

22          THE COURT:  I've got your argument on that one.

23          MR. SCALIA:  And then you have got the bylaws.

24          THE COURT:  I understand your argument on that.  Do

25  you want to address the oppression and the conspiracy, fair

1    dealing?

2          MR. SCALIA:  Yes.  On the shareholder oppression,

3    Your Honor, if you look at what he is alleging factually was

4    done to him, he was squeezed out, is what he says.  He was

5    deprived of employment, and he was offered below fair market

6    value on his option shares.

7          Squeezing out, I am not sure exactly what that means,

8    but I don't believe there is anything underlying -- any

9    unlawful or tortious conduct there.  To the extent it is

10   anything, it is a breach of contract claim.

11         The same with we are depriving him of his employment.

12   That is a breach of contract claim against his employer.

13         And the offering of his shares at a below fair market

14   value, there is no damages because that repurchase has been

15   revoked.  So, that piece of his claim cannot support a claim of

16   shareholder oppression.

17         The Nixon case, and this is a bigger point, the Nixon

18   case, Delaware Supreme Court, is I think right on point.  And

19   in that, it was similar arguments.  And the court said, you

20   know, no, we are not going to create special judicial,

21   after-the-fact judicial remedies for you.  You had the ability

22   to negotiate these rights for yourself at the time of

23   contracting.

24         And that's clearly the case here.  The plaintiff is

25   one of the founding, if not the founding member of the company,

1    a leading director throughout his tenure with the company.  He

2    was personally involved in drafting these contracts, working

3    with the outside counsel to draft them.  He had every

4    opportunity to structure them however he wanted to.  And one

5    can only presume that he did.

6           For whatever reason, he didn't.  He allowed the

7    company to have pretty expansive repurchasing rights and pretty

8    expansive rights in setting a fair market value for the shares.

9    It's not for the Court to come in after the fact and say, oh,

10   we're going to change the deal because it didn't work to your

11   benefit.  I think the Nixon case is right on point.

12          And I think it's undisputed there is no evidence of

13   any express agreement or intent between the parties to provide

14   him with any of the rights that he is now seeking under his

15   shareholder oppression claim as it relates to the stock

16   incentive plan.

17          What right does he have not to be squeezed out?  I

18   mean, to the extent there is a right, it is a contractual

19   right.  He can sue under the applicable contract.  Does he have

20   guaranteed employment?  Well, that is an issue under his

21   contract.  That is a breach of contract claim.

22          And he doesn't -- there is insufficient evidence that

23   any of the particular individual defendants had such a degree

24   of involvement that they were, that they could be liable or

25   culpable under a shareholder oppression claim.

1          I mean, he sued a lot of people, but he hasn't really

2    provided -- he hasn't provided any specific evidence of say,

3    for example, Peter Vangeertruyden.  What did Peter do?  What

4    was his role in all this?  Mac Swindell, what was his role in

5    all of this?  He just talks about them collectively.

6          And for a shareholder oppression claim, I don't think

7    you can do that.  I think you have to look at each of the

8    individual defendants and see what their involvement was.  And

9    there is not sufficient evidence, certainly for summary

10   judgment.

11         And then the final point on the shareholder

12   oppression is that it's my understanding that -- well,

13   factually it is undisputed that plaintiff himself is the single

14   largest shareholder in the company.  And there is no single

15   individual who is a majority shareholder.

16         So, what he has done is lumped a bunch of majority

17   shareholders together to say, ah-hah, they are a majority

18   shareholder and they are oppressing me.  And I don't think

19   that's what, I am sure that that is not what the claim for

20   shareholder oppression is under Delaware law.

21         THE COURT:  All right.

22         MR. SCALIA:  On the implied covenant claim.  We have

23   moved for summary judgment on that as it pertains to the

24   individual defendants.  I think it is a pretty straightforward

25   argument.  Your Honor has heard it a lot before.  It is quite

1  simply that they are not parties to the contract and,

2  therefore, can't be sued under an implied covenant under the

3  contract.

4        It is undisputed that the 2006 stock incentive plan

5  was between EagleEye and the plaintiff, not the individuals.

6        And there is no evidence that the individual

7  defendants were acting in any sort of personal capacity outside

8  of their duties as officers or directors of the company.  To

9  the contrary, I think the undisputed evidence is that they were

10  acting fully within those capacities.

11        And relatedly, Counts 8 and 9 for tortious

12  interference and conspiracy against the individuals, we have

13  moved for summary judgment on those counts as well.

14        And again, the doctrine of intracorporate immunity I

15  think is pretty dispositive of this issue.

16        And again, there is no evidence that any of these

17  individuals had a personal stake.  I think the only argument

18  that plaintiff asserts is that, well, they had an interest in

19  maximizing the value of their shares.

20        Well, every shareholder has that interest.  And their

21  individual interest to maximize the value of their shares is

22  aligned with plaintiff's own interest to maximize the value of

23  his shares.  If the value of their shares goes up, the value of

24  his shares go up.

25        And in any event, that is a personal interest or a

1    personal stake that they have as a shareholders, not as

2    officers or directors.

3         And I think if you look at plaintiff's counts, they

4    are clearly based on -- the allegations are that they were

5    acting in their capacity, but sort of outside the course and

6    scope of their capacity as officers or directors.

7         I think the only other thing, Your Honor, if I can

8    take a few more minutes -- well, I guess we have got the

9    advancement of fees issue.  I don't know if you want to hear

10   from me on that.

11        THE COURT:  Well, I have read your argument about it.

12   And again, I think I'm looking at a contract --

13        MR. SCALIA:  Right.

14        THE COURT:  And I'm determining whether he was

15   entitled to that advancement or not.  So, tell me anything

16   additional you want to tell me.

17        MR. SCALIA:  Quickly, Your Honor, because we have

18   briefed it, but I want to make sure that it is clear.  I think

19   that in order to understand and rule on this issue, you have to

20   look at the contract.  And the contract itself also refers to

21   the Delaware statute, indemnity statute, section 145.  The

22   contract says that the company shall indemnify him as required

23   under, I guess, the certificates of incorporation as well as

24   the Delaware statute.

25        THE COURT:  To the full authority to do so under the

1    statute.

2           MR. SCALIA:  Right.  And if you look at the

3    provisions of the statute, they are clearly -- they say that

4    the company may, it is not required to, but it has the

5    discretion to indemnify an officer or director if the officer

6    or director has acted in good faith and in the best interests

7    of the company.

8           In seeking advancement and ultimately indemnification

9    based on EagleEye's counterclaim against him for bad faith for

10   conduct that is not in the best interests of the company, so

11   there is no possible way that claim, that those claims could be

12   the subject of indemnification under the terms of the contract

13   or the statute --

14          THE COURT:  His argument is that the counterclaim was

15   dismissed by EagleEye, and that it no longer is a part of the

16   case, right?

17          MR. SCALIA:  That is true, it has been dismissed.

18   There were negotiations between me and Mr. Bailey.  Originally

19   we wanted to do it without prejudice.  We had some back and

20   forth.  He wouldn't agree to that.  So, we decided to dismiss

21   it with prejudice.

22          That's not, that's not a ruling on the merits.  There

23   has been no adjudication that our counterclaim for breach of

24   fiduciary duty was without merit.  And there has been no

25   finding that he was in fact acting in good faith and in the

1    best interests of the company.

2            And all of that would be irrelevant anyway because

3    the case law is clear that-- it's kind of like when an

4    insurance company looks at a claim that has been tendered.

5    Under the case law, it is clear that when you look at, when you

6    apply section 145, you look at the nature of the claim being

7    made.  And if you do that here, the nature of the claim is

8    clearly alleging that he was acting outside the course and

9    scope of his duties as an officer and director.

10           So, there is no way it could possibly be the subject

11   of indemnity and, therefore, there is no advancement

12   requirement.

13           THE COURT:  Okay.  All right, thank you.

14           MR. SCALIA:  And I think the only other points are

15   with respect to the Count 3, again going back to Count 3.

16   There is also the good reason issues, and then the termination

17   with or without cause.  I think we have briefed that.  I don't

18   think I need to spend a whole lot of time on that other than to

19   say that we have addressed the change of control.  That was not

20   a good reason and we had the right to cure it, and we did.

21           There was no reduction in the nature or status of his

22   executive duties by virtue of the change of control.  He

23   remained the chief executive officer under the bylaws.  The

24   board never told him that his duties were in any way changed.

25   And that's the only way his duties could have been changed, by

1    board direction.  And there is no evidence of that.

2         So, he is basically just saying, well, you know, it

3    could have happened at some time in the future.  But that's not

4    what happened.

5         And then the company's failure to pay him

6    compensation owed.  That doesn't constitute good reason.  First

7    of all, he didn't identify the compensation that he was

8    referring to.  And it's our position and it has always been our

9    position that that was not money that was owed.  So, that can't

10   form the basis for good reason either.

11        And then on the issue of whether we had cause to

12   terminate him.  I mean, I think for purposes of summary

13   judgment, you will note we did not move for summary judgment on

14   that.  I think that is a difficult issue for this Court to rule

15   on upon summary judgment.

16        So, our only burden here is to show that there is a

17   disputed fact.  I think in fact we can go beyond that and show

18   that if you look at the termination letter, Mr. Barlow set out

19   specific bases for the termination as required under certain

20   parts of the employment agreement.  He gave examples.

21        Plaintiff makes the point that, well, he didn't have

22   all the information and some of the examples he has given are

23   incorrect.  But I don't think either of those points holds any

24   water.  It's unrealistic to expect that a business person

25   making that kind of a decision is going to have all of the

1  facts at his disposal.

2       We have gone through discovery.  I am not sure -- in

3  their case.  And I am not sure we even have all the facts at

4  our disposal, but that's not the requirement here.  That's

5  creating a legal burden that doesn't exist.

6       And in any event, plaintiff does not dispute some of

7  the key reasons that Mr. Barlow gave for the termination.

8  Which are, you didn't create any budgets.  You didn't create

9  any financial spreadsheets.  You know, the corporate documents

10  are a mess, and et cetera, et cetera.  There is no dispute

11  about any of that.

12       His only response to that is, well, that wasn't my

13  fault, that was somebody else.  He is the CEO, Your Honor.  And

14  the board has a duty to its shareholders, and it has the right

15  and arguably the duty to hold its chief executive officer

16  responsible for any mistakes of the company.

17       He also says for the first time in his motion for

18  summary judgment that not being put on to this new executive

19  committee as a full voting member was also a basis for good

20  reason.  It's not in his notice of resignation letter.  But in

21  any event, this was a new committee that was created.  He

22  didn't have any right to be on it in the first place.  He was

23  on it, he just didn't have a vote.  But the fact that he was on

24  it meant that he was given more rights and more power than he

25  had before that was created.

1              THE COURT:  Okay.  All right, thank you.

2              MR. SCALIA:  Thank you, Your Honor.

3              THE COURT:  Mr. Bailey, do you want to respond?

4              MR. BAILEY:  Your Honor, I actually don't have much

5    to say in response.  I would just note there was a discussion

6    about Count 3, confusion about that it was for wages.

7              If you look at paragraph 88 of our third amended

8    complaint, docket 75-2, we actually specifically say it is

9    breach of contract for both executive and clinical services.

10   And then we say:  To wit, 2006, 2010, 2010 ICA, and July 31

11   confirmation e-mail.

12             Dr. Singleton explained very carefully and with all

13   of the documents necessary at his deposition all the money that

14   he was owed based on that.  He actually went into quite some

15   detail, which is actually in our briefing papers.

16             And I have a response on Nixon, the Nixon Delaware

17   court.  That was a case where someone said they were frozen out

18   because they did not get a dividend.  That is quite a different

19   factual situation from this case.

20             I would take a look at the Hollis v. Hill seven

21   factor test on freeze-outs.  It is a Circuit Court decision

22   which we cite in our papers.  And it has seven factors.  That

23   he was a significant shareholder.  That he was a founder.  That

24   he expected, you know, what he expected, et cetera.  I would

25   just note that case.  It is all in our papers.

1              I don't have a whole lot to add.  There was another

2    point, there was a notion that the section 8 or section 10

3    change of control would provide a massive severance.  I was

4    going to, but I didn't, attach a CCH article on these, it is

5    readily available on the Web, but it is standard for executive

6    contracts to have three years compensation when you leave.

7              That is pretty much what you get.  There is a whole

8    IRS regulation on how you do it.  So, it's kind of analogous to

9    a section 409(a) on severance provision.  There is a whole body

10   of law on this, and that's a standard provision.

11             And I would just say, I think paragraph 10, EagleEye

12   says that paragraph 10 would render paragraph 8 meaningless,

13   except after Dr. Singleton gets his change of control payment,

14   he doesn't have to terminate his employment.  He might say, you

15   know what, I feel comfortable now, I want to stay.  I mean,

16   that's how that works.  He doesn't have to terminate his

17   employment after that.

18             So, I have nothing else to add, Your Honor, unless

19   you have specific questions.

20             THE COURT:  I don't.  We haven't worked our way all

21   the way through this, but I can tell you that the 2006 and 2010

22   agreements lay out compensation in the multiple agreements.

23   They have been pled.  The argument that there is no notice is

24   not accurate.  And whether it is 1099 compensation or wages

25   compensation, you know, they are covered under these contracts

1    and have been pled as having been breached and damages are

2    owed.

3           I can say very clearly that I am going to grant

4    summary judgment as to Counts 1, 2 and 3.  I haven't worked my

5    way through with finality the 2011 amendment, I need to look at

6    that a little more carefully.  And Mr. Scalia has raised some

7    good points that I have been considering on the 2011.

8           But it doesn't make a whole lot of difference.  I

9    don't find any evidence in the record that disputes that

10   amounts are due and owing under those contracts over those

11   years and the percentages reflected in the different

12   agreements.

13          I don't find that there is an inconsistency in

14   paragraphs 8 and 10 of the 2010 agreement.  I think they stand

15   alone.  I think the language is clear in paragraph 10 that if

16   EagleEye decides to reconstitute the board and a change of

17   control occurs, that Dr. Singleton is entitled at that stage to

18   seek his severance at that time or not.  And he did so.

19          And that's at the time that the board was

20   reconstituted.  It was consummated at that time.  And he is

21   entitled to his severance if he chose to take it at that time.

22          And in looking at the alternative under paragraph 8,

23   you know, it was money owed to him.  If that was the only

24   section that would be necessary to look it, I'd grant summary

25   judgment on that basis, but I don't need to.  Paragraph 10 is

1    complete and stands alone and is not inconsistent.

2         The quantum meruit claim would be necessary or

3    unnecessary based on the 2011 amendment whether it is a

4    contract or not.  I am not sure whether there are really wages.

5    There was the December payment, I guess he was entitled to 30

6    days of notice, and was not paid for that 30 days in December.

7    I am not sure whether that would then be a count which would be

8    duplicative given the contract decision.

9         The shareholder oppression and the implied good faith

10   and fair dealing, Mr. Scalia has a good point with regard to

11   the implied covenant of good faith and fair dealing as it deals

12   with the individuals, and we will look at that.

13        But I have not fully evaluated the shareholder

14   oppression and whether that contains material facts that are

15   still in dispute.

16        And it appears to me that Dr. Singleton is entitled

17   to the advancement of litigation expenses based on the

18   contractual language.

19        And the position of the parties at the time of the

20   litigation and the conspiracy, of course, will be looked at in

21   the same light.  I need to look at that some more.

22        And so, I think we've talked about this right in the

23   beginning of the case -- I mean, this is EagleEye

24   Radiology's -- it's a revisionist history of what occurred.

25   They have by their e-mails clearly identified that they wanted

1   Dr. Singleton -- you know, they didn't want to be under his

2   tutelage and supervision.  And they went behind his back

3   instead of approaching him directly, and agreed through a

4   systematic number of changes to force him from leadership.

5        And the board, they did so, and then realized that,

6   because they weren't sophisticated, that they had to amend what

7   they were doing.  And they made a bigger mess out of it.  And

8   then they continued to make an even bigger mess out of it.

9        But the bottom line is that Dr. Singleton had a

10  contract.  The contract was violated.  He is entitled to his

11  severance and his backpay.  And whether he is entitled to seek

12  further damages for the oppressive way that it was done and the

13  conspiracy, I will take a look at that.

14       We will get you out a partial -- an order granting

15  partial summary judgment and reserving the others.

16       And you rethink whether you need to try and resolve

17  this case.  In my looking at it, trying to look at it from both

18  sides as a practitioner when I am deciding whether to recommend

19  to the parties that they try and settle a case or not settle a

20  case, I think I looked at this early on and saw that the merits

21  of the case were in Dr. Singleton's favor.

22       I can tell you without hesitation that some of these

23  e-mails that went back and forth behind Dr. Singleton's back

24  are poisonous to the defendant.  And any reasonable jury, if

25  this gets to a jury, are going to find that the merits of the

1    case are factually overwhelmingly in Dr. Singleton's favor.

2         The only thing that may prevent a significant verdict

3    in excess of the severance payment and the backpayment that he

4    is due would be a legal bar to it.  And that is something we

5    will look at quickly or directly.

6         And lawyers and parties look at cases and they become

7    convinced that their side is correct.  And I was as much guilty

8    of that as anyone as a litigator.  But you have to take a step

9    back and look at it and have somebody else look at it.  I am

10   attempting to do that for you.  It's not so that I don't have

11   to try a case because I enjoy trying cases.  This is not in my

12   mind a triable case for a defendant unless the demand made is

13   totally unreasonable and can't be met.  And I hope that that

14   would not be the case.

15        So, you continue to try and work and settle this.

16   And let's try and put the vexatious thoughts out of your mind

17   and see if you can't come to resolution.  We will work on our

18   side on getting an opinion out as quickly as we can.

19        What's the trial date?

20        MR. BAILEY:  Tuesday after Thanksgiving, Your Honor.

21        THE COURT:  All right.  So, we will get something

22   going as soon as we are able to.  We will get you out a

23   decision.  You keep talking.  All right.

24        MR. SCALIA:  Your Honor, may I just make sure that I

25   understand the scope of your ruling, at least as it stands

1   right now?

2         THE COURT:  Yes, sir.

3         MR. SCALIA:  So, with respect to Count 1, granted in

4   plaintiff's favor.  Count 2 as well.

5         And then Count 3, which is the big one --

6         THE COURT:  The severance.

7         MR. SCALIA:  And you're finding that there was a

8   change of control and that consummation meant immediately.  And

9   are you making a ruling with respect to the good reason and the

10  cause?

11        THE COURT:  I don't find that section 8 in any way

12  conflicts with section 11, and section 11 governs.  And as a

13  result, I don't need to make that finding.  The money is due

14  and owing under section 11.

15        MR. SCALIA:  And then the quantum meruit claim, I

16  just want to clarify our position because it was sort of taken

17  or distorted somewhat.

18        Our position is that, you know, if the 2011 agreement

19  doesn't apply, then the parties go back to the 2010 agreement.

20  And if the 2010 agreement doesn't apply for some reason, then

21  the 2006 agreement applies.

22        So, there is no situation from our perspective and

23  from our position where there is not a governing contract.  And

24  so, that's our position with respect to the quantum meruit,

25  that it wouldn't apply for that reason.

1          And then your thought is the shareholder oppression

2    is just as against the individual defendants, and you're taking

3    that under advisement?

4          THE COURT:  Under advisement, right.

5          MR. SCALIA:  And the implied covenant, Count 6, is

6    against both EagleEye and the individual defendants, and your

7    ruling --

8          THE COURT:  Well, I didn't rule specifically on that.

9    I think that you're correct, I think it needs to be limited to

10   the corporation.  But I want to look a little more closely at

11   that.

12         MR. SCALIA:  And then you're also going to give some

13   more thought to the tortious interference and conspiracy

14   claims?

15         THE COURT:  Yes.

16         MR. SCALIA:  Thank you, Your Honor.

17         THE COURT:  All right, thank you.  We are in recess.

18   -------------------------------------------------

19

20

21          I certify that the foregoing is a true and

22      Accurate transcription of my stenographic notes.

23

24          /s/  Norman B. Linnell
            Norman B. Linnell, RPR, CM, VCE, FCRR
25